987 So.2d 1002 (2007)
Harriet CANTRELL, Appellant
v.
James GREEN, M.D. and Meridian Orthopaedic Clinic, Appellees.
No. 2006-CA-00025-COA.
Court of Appeals of Mississippi.
September 4, 2007.
Rehearing Denied January 22, 2008.
*1003 James M. Mars, T. Jackson Lyons, Jackson, attorneys for appellant.
Lonnie D. Bailey, Tommie Williams, Greenwood, attorneys for appellees.
Before MYERS, P.J., CHANDLER and ISHEE, JJ.
MYERS, P.J., for the Court.
¶ 1. Harriet Cantrell brought suit against James Green, M.D. and Meridian Orthopaedic Clinic (MOC) in the Circuit Court of Lauderdale County, alleging that her post-operative care following her hip replacement surgery fell below the standard of care. As a result, Cantrell alleged that MOC and Dr. Green's substandard care was the proximate cause of her fixed abduction contracture (FAC), leaving her with significant pain and a limp. At the December 6, 2005, trial on the matter, after the close of Cantrell's case-in-chief, MOC and Dr. Green moved for a directed verdict and the motion was granted. Aggrieved, Cantrell asks this Court to determine whether the circuit court erred in granting MOC and Dr. Green's motion for directed verdict. Finding the decision of the circuit court erroneous, we reverse and remand this case for a new trial.

FACTS
¶ 2. Cantrell developed avascular necrosis or "bone death" in her right hip as a result of continued regular injections of the steroid prednisone, used to treat her blood disease idiopathic thrombocytopenia. Cantrell consulted with Dr. Green to perform hip replacement surgery and the surgery was performed on May 9, 2000. Thereafter, Cantrell remained in the hospital and received inpatient physical therapy for approximately six days until her discharge.
¶ 3. At trial, testimony was offered during Cantrell's case-in-chief from Cantrell, herself, Cantrell's father, and Dr. Roger Dee, an expert retained by Cantrell. Dr. Green was also called as an adverse witness, and testified regarding his care. Several exhibits were also introduced during Cantrell's case-in-chief. The testimony and evidence offered at trial adduced that during her post-operative care, Dr. Green prescribed in-home physical therapy provided by Sta-Home Health Agency that was to continue until June 16, 2000. On May 17, 2000, Cantrell began her in-home physical therapy with physical therapist, David Pettigrew. Over the course of her physical therapy sessions, Pedigrew observed what he considered to be a substantial leg length disparity (LLD) between Cantrell's left and right leg. Pedigrew measured the LLD with a ruler and noted that Cantrell's right leg was approximately one and one-half inch longer than her left leg. According to Cantrell, Pedigrew then notified Dr. Green of the suspected LLD. On June 5, 2000, Dr. Green compared pre- and post-operative x-rays of Cantrell's right leg and confirmed the suspected LLD. However, Dr. Green determined that the LLD was only 1.5 centimeters, as opposed to the therapist's measurement of one and one-half inch, and opined that such a discrepancy was acceptable. Cantrell testified that Dr. Green did not advise her that LLD was a possible result of the surgery.
¶ 4. On June 6, 2000, Dr. Green ordered a hold on Cantrell's physical therapy because she had "progressed well" and he determined that full weight-bearing walking would be the only further therapy required. Dr. Green next saw Cantrell, at her request, on June 20, 2000. Again, Cantrell complained of the LLD. Dr. Green assessed Cantrell's LLD by having her stand up with both feet level on the ground. Cantrell testified that when she *1004 stood with her right foot flat on the ground, her left foot did not reach the ground. Cantrell testified that during this June 20, 2000 visit, Dr. Green stated that the LLD was caused by a pelvic obliquity or tilt caused by the tightening of the abductor muscles as a result of compensating for the LLD and that it would resolve itself over time through full weight-bearing exercise. However, Dr. Green did not note any FAC deformity during this visit.
¶ 5. Dr. Green discharged Cantrell from physical therapy on June 27, 2000, at which time the Sta-Home Health Agency nurses noted that the abduction (movement away from the body's midline) and adduction (movement towards the body's midline) of her right leg was within normal functional limits. Unsatisfied, Cantrell sought treatment from Gregory Terral, M.D. at Capital Orthopaedic Clinic in Jackson on October 20, 2000. Dr. Terral examined Cantrell noting that her right hip had an "excellent range of motion" and that it was "properly positioned and sized." Dr. Terral agreed with Dr. Green's assessment that the LLD was approximately 1.5 centimeters, and he noted no FAC deformity. Cantrell then went to a third orthopaedist, T. Buggs, Jr., M.D., in Birmingham, Alabama. Dr. Buggs confirmed a 1.5 centimeter LLD and prescribed a prosthetic shoe lift. Dr. Buggs did not note any FAC deformity.
¶ 6. After consulting with a lawyer, Cantrell was examined by Roger Dee, M.D., a professor of orthopaedics at New York University, Stonybrook, on May 27, 2003, more than three years post-surgery. Dr. Dee has performed more than 2,000 hip replacement surgeries in his career and is considered a pioneer in the field. Dr. Dee examined Cantrell by palpitating her hip while she was lying supine on the examining table and determined that she had a thirty-degree FAC deformity of the right hip. At trial, Dr. Dee testified that an FAC occurs when the abductor muscle running along the side of the hip is not properly stretched through post-surgery physical therapy and becomes fixed in the contracted position. Ultimately, Dr. Dee testified at trial that an FAC would be obvious to any orthopaedist. Dr. Dee further testified that if the condition was present when Cantrell last visited Dr. Green on June 20, 2000, then Dr. Green's post-operative care, or more specifically the discontinuation of Cantrell's physical therapy on June 6, 2000, would be a breach of the standard of care.

STANDARD OF REVIEW
¶ 7. We are to conduct a de novo review of a trial court's grant or denial of a motion for directed verdict. Morgan v. Greenwaldt, 786 So.2d 1037, 1041-1042(¶ 10) (Miss.2001). "In reviewing a motion for a directed verdict [an appellate court] must decide whether the facts presented, together with any reasonable inferences, considered in the light most favorable to the nonmoving party, point so overwhelmingly in favor of the movant that reasonable jurors could not have returned a verdict for the plaintiff." Robley v. Blue Cross/Blue Shield, 935 So.2d 990, 996(¶ 16) (Miss.2006). If such an issue has been presented to the jury that creates a question of fact, the motion should not be granted. Morgan, 786 So.2d at 1041-1042(¶ 10).

DISCUSSION
¶ 8. In order to establish a prima facie case of medical negligence in a case such as this, a plaintiff has to produce substantial evidence of (1) the existence of a physician-patient relationship, (2) expert testimony as to the relevant professional standard of care, (3) expert testimony that the physician's conduct fell below the relevant *1005 standard of care, (4) an injury to the plaintiff resulting from the physician's breach of the standard of care, and (5) damages. Cheeks v. Bio-Medical Applications, Inc., 908 So.2d 117, 120(¶ 8) (Miss. 2005). "It is our general rule that in a medical malpractice action negligence cannot be established without medical testimony that the defendant failed to use ordinary skill and care." Id. (quoting Brooks v. Roberts, 882 So.2d 229, 232 (Miss.2004)).
¶ 9. MOC's and Dr. Green's motion for a directed verdict was granted because the trial court found that Cantrell presented no evidence in her case-in-chief substantiating that substandard post-operative care caused a thirty-degree FAC deformity existing on June 20, 2000, or even that such a deformity existed at the time of trial. The trial court further found that since her own expert testified that if the FAC deformity did not exist when Dr. Green last examined Cantrell then Dr. Green's course of treatment did not fall below the standard of care. Further, the circuit judge found that no such FAC condition existed at the time of trial because Cantrell demonstrated for the court at trial that she could abduct her leg away from her body's midline.
¶ 10. During Cantrell's case-in-chief, testimony was provided by Cantrell's medical expert, Dr. Dee. Dr. Dee testified that although the two-centimeter LLD did not cause Cantrell's FAC deformity, the failure of Dr. Green to communicate and instruct the physical therapist and the subsequent discontinuation of physical therapy after Cantrell's surgery caused the FAC. In Dr. Dee's opinion, Dr. Green should have identified the FAC deformity. Dr. Dee opined that if Dr. Green had identified the FAC problem during Cantrell's post-operative care, that the condition could have been resolved or eliminated by ordering physical therapy to stretch Cantrell's muscle. Dr. Dee further testified that in his medical opinion, on June 20, 2000, Cantrell should have received targeted, specialized medical and physical therapy treatment to correct her FAC deformity.
¶ 11. As to the issue of whether Cantrell provided any evidence regarding the existence of the FAC continued until the time of trial, we point out that Cantrell performed a demonstration at trial showing that when she stood with her right foot flat on the floor, her left foot could not touch the ground. In order to stand with both feet on the ground, Cantrell had to bend her right knee and tilt her pelvis.
¶ 12. In light of the testimony presented by Dr. Dee and Cantrell's in-court demonstration, we find that several facts in this case were in dispute. While Dr. Green testified that the FAC condition was not present during Cantrell's June 20, 2000 visit, Dr. Dee testified that on June 20, 2000, Dr. Green should have ordered targeted physical therapy to correct Cantrell's FAC condition. This conflict in the existence of a FAC deformity on June 20, 2000, is a quintessential example of a material issue of fact to be resolved by the jury. Considering the evidence presented during Cantrell's case-in-chief, we find that a reasonable jury could have returned a verdict in favor of Cantrell. Whether or not the FAC as demonstrated by Cantrell existed on June 20, 2000, essentially boils down to a "battle of the experts," through which the jury must determine the victor. The circuit court erred in granting MOC's and Dr. Green's motion for directed verdict. Therefore, we reverse the judgment of the Lauderdale County Circuit Court and remand this case for a new trial.
¶ 13. THE JUDGMENT OF THE LAUDERDALE COUNTY CIRCUIT COURT IS REVERSED AND REMANDED FOR A NEW TRIAL. ALL *1006 COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEES.
KING, C.J., LEE, P.J., IRVING AND ISHEE, JJ., CONCUR. CARLTON, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY CHANDLER AND BARNES, JJ. GRIFFIS AND ROBERTS, JJ., NOT PARTICIPATING.
CARLTON, J., Dissenting:
¶ 14. Because I find that Cantrell presented no evidence that Dr. Green breached the standard of care in his post-operative treatment, I respectfully dissent. I find that substantial evidence supports the trial judge's determination, and further that the record does not enable this Court to review the most crucial evidence presented  Cantrell's in-court physical demonstration. Therefore, I would affirm the trial court's grant of a directed verdict in favor of Dr. Green and MOC.
¶ 15. Dr. Dee's criticism was limited to Dr. Green's post-operative care.[1] His criticism was based on the FAC Dr. Dee purported to observe in Cantrell's right hip on May 27, 2003, together with his assumption that the condition was present on June 20, 2000, the last date on which Dr. Green examined Cantrell. To this end, Dr. Dee testified that if the thirty-degree FAC existed when Cantrell was last treated by Dr. Green, then he should have identified the condition and ordered "focused physical therapy" to correct it. Dr. Dee admitted that he would have no valid criticism of Dr. Green's post-operative care if the FAC was not present on June 20, 2000. The issue then is whether Cantrell had an FAC on June 20, 2000.
¶ 16. The only evidence to suggest that the condition was present on the date in question was the testimony of Dr. Dee himself, who opined that Cantrell had an FAC of thirty degrees on June 20, 2000. Dr. Dee arrived at this conclusion because, in his opinion, there was no other way he could explain why Mr. Pettigrew measured an LLD of an inch and a half, when he (Dr. Dee) knew that the true measurement of the LLD was two centimeters. However, Dr. Dee did not review Dr. Green's deposition or view the x-rays of Cantrell's hip taken by Dr. Terrell, nor did he take an x-ray of Cantrell's hip when he himself examined her in 2003.
¶ 17. Beyond Dr. Dee's opinion, the record is devoid of evidence that an FAC existed on June 20, 2000. During the course of her physical therapy, Cantrell was regularly visited by registered nurses. After each visit, the nurses completed a report which had a place for the nurse to check if a contracture was present in Cantrell's hip. Not once was a notation made that a contracture was present. At the time of Cantrell's discharge from physical therapy on June 27, 2000, Mr. Pettigrew's physical therapy evaluation noted that Cantrell's range of motion in her right hip for abduction was "within normal limits," and for adduction was "within functional limits."
¶ 18. In their examinations of Cantrell, neither Dr. Green, Dr. Terrell nor Dr. Buggs noted or recorded a fixed abduction deformity.[2] At the June 20, 2000 visit, Dr. Green addressed Pettigrew's and Cantrell's *1007 anxieties about the LLD. After conducting a physical examination and taking x-rays of Cantrell's hip, Dr. Green determined that Cantrell had an LLD of one and a half centimeters and ordered that she advance to a full weight bearing walk in her physical therapy. Over the span of two years following the surgery, Cantrell saw two other orthopaedic surgeons, Dr. Terrell and Dr. Buggs. Dr. Terrell's office record from October 2000 reflects that Cantrell had an "excellent range of motion" in her right hip, which Dr. Terrell noted was "properly position[ed] and sized." In June 2002, Cantrell saw Dr. Buggs who examined her and took x-rays of her right hip. Dr. Buggs did not note or describe an FAC.
¶ 19. In determining whether a jury issue had been presented, the trial judge relied on Ms. Cantrell's in-court physical demonstration, in which she got out of the witness stand and demonstrated her ability to move her hip, legs and pelvis.[3] The majority brands this demonstration as evidence that the FAC existed on June 20, 2000. To the contrary, I find that the in-court demonstration only established that the LLD  the difference in the length of her left and right legs  existed on June 20, 2000, as it did on the day of trial.[4] This difference of opinion should be resolved in favor of the trial judge's determination, because he was able to observe the physical demonstrations, whereas, our review is limited to a cold paper record. Jackson v. Locklar, 431 So.2d 475, 479 (Miss.1983) (citing Culbreath v. Johnson, 427 So.2d 705, 708 (Miss.1983)) ("We see the testimony the trial judge heard. We do not, however, observe the manner and demeanor of the witnesses. We do not smell the smoke of the battle."). The issue presented in this appeal largely turns on Cantrell's physical demonstration; therefore, this appeal presents a particularly relevant situation in which the trial judge's determination of whether an issue of fact remains for the jury should be afforded great deference.
¶ 20. After hearing and observing all of the evidence himself, the trial judge found that there was no fact issue for the jury as to whether Cantrell had an FAC when she last saw Dr. Green on June 20, 2000. Because we are unable to review the most pivotal evidence presented in this case, I would affirm the trial court's grant of a directed verdict.
CHANDLER AND BARNES, JJ., JOIN THIS OPINION.
NOTES
[1] Dr. Dee testified that Dr. Green did not breach the standard of care in the performance of the surgery by leaving Cantrell with a two-centimeter LLD. He also testified that the two centimeter LLD did not cause the FAC.
[2] Dr. Dee testified that a proper examination of a patient with an FAC by an orthopaedic surgeon would reveal the condition if present, and also that the condition would be apparent on an x-ray.
[3] Expert testimony adduced that a fixed abduction contracture is a "condition of fixed resistence" in which the hip is in a "stuck-type position" that would not move.
[4] It is undisputed that Dr. Green's surgery left Cantrell with an LLD and that Dr. Green did not breach the standard of care in his performance of the surgery by leaving her with this difference in leg lengths.